# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MARY JO TOLLISON,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **No. 2:12-cv-00004** |
| | ) | **Judge Nixon/Brown** |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **COMMISSIONER OF THE SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

**To: The Honorable Judge John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

For the reasons explained herein, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion for judgment on the administrative record (the record) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

The plaintiff filed for Supplemental Security Income (SSI) on July 7, 2008 (DE 10, pp. 137-40).[1] She claimed an onset date of June 30, 2007 (DE 10, p. 137) and disability due to the following: a hernia;[2] gallstones;[3] pain; bleeding; and difficulty walking, bending, or lifting (DE 10, p. 153). On September 10, 2008, the Commissioner denied the SSI claim (DE 10, p. 60). On September 16, 2008, the plaintiff timely filed for reconsideration (DE 10, p. 64). On November 7, 2008, the Commissioner again denied the SSI claim (DE 10, p. 68).

---

1 Page numbers referring to the record herein reflect the Bates Stamp.
2 Dorland's Illustrated Medical Dictionary 848 (Elsevier 2012) (1900) (Hernia: "the protrusion of a loop or knuckle of an organ or tissue through an abnormal opening.").
3 *Id.* at 756 (Gallstone: "a concretion formed in the gallbladder or bile duct, the usual composition is cholesterol, a blood pigment liberated by hemolysis, or a calcium salt.").

Case 2:12-cv-00004   Document 19   Filed 07/05/13   Page 1 of 23 PageID #: 396

On November 21, 2008, the plaintiff timely requested a hearing before an Administrative Law Judge (ALJ) (DE 10, p. 70). On January 25, 2010, the plaintiff appeared before the ALJ, K. Dickson Grissom (DE 10, pp. 36-57). The ALJ requested a consultative medical examination (DE 10, p. 55) and scheduled a supplemental hearing, which took place on July 26, 2010 (DE 10, pp. 22-35). Also appearing was Ernest Brewer, the vocational expert (VE) (DE 10, pp. 29-34). On August 23, 2010, the ALJ decided that the plaintiff was not disabled under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1382(c)(a)(3)(A) (DE 10, p. 17). On August 23, 2010, the plaintiff timely requested that an Appeals Council (AC) review the decision (DE 10, p. 1). On November 18, 2011, an AC denied the request (DE 10, pp. 1-6).

On January 20, 2012, the plaintiff timely brought the instant action (DE 1). On May 7, 2012, the defendant filed his answer and the record (DE 9-10). On August 12, 2012, the plaintiff filed the motion for judgment on the record (DE 12) and memorandum in support of the motion (DE 13) pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Social Security Administration, through its Commissioner, as set out by the ALJ. On October 25, 2012, the defendant filed a response in opposition (DE 18).

The matter is now properly before the Court.

## II.　　　Review of the Record

### A.　　　Relevant Medical Evidence

On March 20, 2008, the plaintiff presented to Putnam County Primary Care Clinic with an enlarged stomach area (DE 10, p. 250). The plaintiff reported that her stomach had increased in size gradually over the past two years, but rapidly over the past 6 months (DE 10, p. 250). The plaintiff reported that she had taken care of her mother for the past year, done a lot of lifting, and gained approximately one hundred pounds over the past one to two years (DE 10, p. 250). The

Case 2:12-cv-00004   Document 19   Filed 07/05/13   Page 2 of 23 PageID #: 397

Clinic's plan included blood tests and an abdominal imaging test (DE 10, p. 250). On April 03, 2008, the plaintiff was given the blood test results and was strongly encouraged to schedule an imaging test (DE 10, p. 251). However, the record does not reflect that an imaging test was done.

On July 07, 2008, the plaintiff presented to the Putnam County Primary Care Clinic with reports of nausea, pain, and spitting up blood (DE 10, p. 249). She was diagnosed with a gallstone and a ventral[4] hernia (DE 10, p. 249). The plan included a referral for surgery and contacting a foundation to find funds for surgery (DE 10, p. 249).

On March 29, 2010, the plaintiff presented to Cookeville Regional Emergency Department (ED) with shortness of breath, nausea, vomiting, sweating, and chest pain (DE 10, p. 285). She was diagnosed with pneumonia and treated (DE 10, p. 283). Upon discharge on April 03, 2010, the plaintiff was encouraged to follow up with Dr. f/n/u/ Henson because she did not have a primary care provider (PCP) (DE 10, p. 283). The plaintiff "was given a list of surgeons to call about her large ventral hernia and the possibility of its repair." (DE 10, p. 283).

### B.      Testimonial Evidence

### 1.      Plaintiff Testimony

On January 25, 2010, the plaintiff testified on direct examination by the ALJ (DE 10, pp. 36-57). The ALJ asked the plaintiff whether she understood her right to have representation and whether she wanted to waive that right (DE 10, pp. 39-40). The plaintiff answered affirmatively (DE 10, pp. 39-40). The plaintiff testified that she was 5'4, weighed about two hundred and forty pounds, was 52 years old, and had graduated from high school (DE 10, pp. 45-46).

The ALJ reviewed the plaintiff's work history for the past fifteen years and considered the plaintiff's past work as a clerk at a pet resort, and as a cashier, including a cashier position at

---

4 *Id.* at 751 (Ventral: "abdominal.").

a gasoline service station (DE 10, pp. 29-31, 46-51). The plaintiff testified that she quit working at the pet resort because she "just couldn't handle it. By the time [she] got home, [she would] be in tears and dreading even getting out of the vehicle, just standing up, [she would] start passing blood at times when [she] did too much." (DE 10, p. 51).

The ALJ asked the plaintiff whether she took any medication (DE 10, p. 51). The plaintiff testified, "I take Aleve and stuff because I can't find a physician that will take me." (DE 10, p. 51). The plaintiff testified that when she called physicians' offices, "the first question they [would] ask is what kind of insurance, and then they're not taking new patients." (DE 10, pp. 51-52). The ALJ asked the plaintiff to describe her conditions and how they prevented her from working (DE 10, p. 52). The plaintiff testified, "I have got a hernia that has busted out, and…gallstones [a]nd they told me...that they will not be able to conduct surgery...They can't even fix my gallstone because…my intestines are out…the lining has completely busted open." (DE 10, p. 52).

The ALJ asked the plaintiff to describe her daily routine (DE 10, p. 52). The plaintiff testified that she spent her days "[g]oing nuts." (DE 10, p. 52). The ALJ asked for clarification and the plaintiff testified, "I do sit around the house mostly…I have trouble sleeping…mostly just try to get by, talk to my friend...I talk to my son." (DE 10, p. 52). The plaintiff testified that her husband did most of the chores and that when she tried to cook, she would have to sit down because of pain (DE 10, p. 54). She testified that she could "barely get behind the steering wheel" because of the size of her hernia (DE 10, p. 54). She testified that she had back pain, which she attributed to her hernia (DE 10, p. 54). The ALJ asked the plaintiff whether she smoked, and the plaintiff testified that she did "every now and then," and that her "nerves get so bad." (DE 10, p. 53).

At the second hearing on July 26, 2010, the ALJ asked the plaintiff whether she continued to smoke (DE 10, p. 27). The plaintiff testified that she quit before her admission to the hospital on March 29, 2010 (DE 10, p. 27). The ALJ noted that documents from that hospitalization had a "very heavy tobacco aroma…." (DE 10, p. 27). The ALJ asked the plaintiff three times if there was "anything else" that she wanted to tell him (DE 10, p. 28). The plaintiff testified that she was told she "needed to get something done" for her hernia (DE 10, p. 28).

## 2.    Vocational Expert Testimony

At the second hearing, the ALJ called the VE to testify. The ALJ informed the VE that the plaintiff had "worked in the clerical capacity for a pet resort" and that she had also been "a cashier at a gas station." (DE 10, p. 29). The VE testified that the plaintiff's past work in the clerical capacity "would be classified as entry level, unskilled work at the light level" and that the plaintiff's past "work as a cashier would be classified at sedentary,[5] per the [Dictionary of Occupational Titles] (DOT) 211.462-014…light, unskilled.[6]" (DE 10, p. 31).[7]

The ALJ then presented the VE with hypothetical scenarios, including a hypothetical person with a residual functional capacity (RFC) of a full range of light work (DE 10, p. 32).

> The first hypothetical included a person who would require a job with a sit/stand option, and the ability to change positions after 30 minutes of standing or walking. There would be no limit on sitting. The person could not climb, kneel, crouch, crawl, work around hazards, or do repetitive or frequent pushing or pulling with their legs.

---

[5] 20 C.F.R. § 416.967 ("To determine the physical exertion requirements of work in the national economy, [jobs are classified] as **sedentary, light, medium, heavy, and very heavy**.") (emphasis added).

[6] 20 C.F.R. § 416.968 ("In order to evaluate [the plaintiff's] skills…occupations are classified as **unskilled, semi-skilled, and skilled**.") (emphasis added).

[7] There is some ambiguity in the VE's testimony about whether the plaintiff's past work as a cashier would be **sedentary** or **light**. The physical exertion requirements indicated in DOT 211.462-014, which describes work as a cashier-checker, are "**in excess of those for [s]edentary [w]ork**." DICOT 211.462-014, 1991 WL 671841 (emphasis added). The VE testified that the plaintiff's past work as a cashier would be sedentary and then immediately testified that the same work would be light (DE 10, p. 31). Regardless of this ambiguity, "the regulatory definitions of exertional levels are controlling…[and] if all available evidence (including VE testimony) establishes that the exertional demands of an occupation meet the regulatory definition of [a level of exertion]…the adjudicator may not rely on VE testimony that the occupation is [of another level of exertion]." SSR 00-4P, 2000 WL 1898704.

(DE 10, p. 32). The VE testified that, under this hypothetical, the plaintiff could return to her past work as a gas station cashier, with a sit/stand accommodation, and that there were approximately 12,000 such cashier positions in Tennessee and 118,000 positions nationally (DE 10, p. 32).

The second hypothetical included the same restrictions as the first. The ALJ also asked the VE to consider the plaintiff's age, education, and past relevant work.

(DE 10, p. 33). The VE testified that, under this hypothetical, there would be other jobs that the plaintiff could perform "that would be entry level [unskilled][8]" with the sit/stand option (DE 10, p. 33). The VE listed the following jobs: (1) appointment clerk, with 1,300 positions in Tennessee and approximately 135,000 positions nationally; (2) laundry clerk, with 1,075 positions in Tennessee and approximately 65,000 nationally; (3) inspector/grader, with 1,300 positions in Tennessee and 179,000 positions nationally (DE 10, p. 33).

The third hypothetical included the same restrictions as the first and second. The ALJ also asked the VE to consider a person with mild to moderate pain.

(DE 10, p. 34). The VE testified that, under this hypothetical, he would not change his testimony (DE 10, p. 34).

The fourth hypothetical included the same restrictions as the first and second. The ALJ also asked the VE to consider a person with severe pain.

(DE 10, p. 34). The VE testified that this hypothetical "would eliminate the jobs that [he] identified, and [he did not] know of any other work [the plaintiff] could do." (DE 10, p. 34).

The fifth hypothetical included the same restrictions as the first. The ALJ also asked the VE to consider a person who "would be precluded from working around any environmental pollutants...."

---

8 Case law and use by the VE show "entry-level" is a skill level, synonymous with "unskilled." S*ee Prichard v. Astrue*, No. 2:08-0055, at \*8 (M.D. Tenn. Feb. 28, 2011) *report and recommendation adopted*, 2:08-0055 (M.D. Tenn. Mar. 25, 2011) ("The ALJ asked the VE to consider what type of work the plaintiff could perform if he had a light and sedentary RFC...and the VE replied that the plaintiff would be able to work as an **unskilled entry level** security guard, *as an unskilled entry level* cashier....") (emphasis added); *See* (DE 10, p. 31) ("[Plaintiff's past work in the clerical capacity] "would be classified as *entry level*, *unskilled work* at the light level.") (emphasis added).

(DE 10, p. 34). The VE testified that, under this hypothetical, he would not change his testimony (DE 10, p. 34).

> The sixth hypothetical included the same restrictions as the first. The ALJ also asked the VE to consider a person with "impairments that would preclude the ability to work on an eight hour a day, five day[s] a week basis…or [a] comparable schedule."

(DE 10, p. 34). The VE testified that this would prevent the plaintiff from doing any of the jobs identified and that he did not know of any other jobs that the plaintiff could do (DE 10, p. 34).

### C.    Consultatative Medical Examination

On March 24, 2010, the plaintiff underwent a medical consultative examination at the request of the ALJ (DE 10, pp. 271-80). Donita Keown, M.D. performed the examination (DE 10, pp. 271-80). During the examination, the plaintiff reported that she was unable to work because of her hernia, and that she experienced daily abdominal discomfort, which interrupted her sleep and caused both fatigue and shortness of breath (DE 10, p. 272). The plaintiff also reported that she had gallstones, but that she could not find a provider to remove the gallstones or to remove the gallbladder because of the hernia (DE 10, p. 272).

Upon physical examination, Dr. Keown reported that the plaintiff was 5'3 without shoes and weighed three hundred and eight pounds (DE 10, p. 273).[9] Dr. Keown reported that the plaintiff's hernia measured 45cm from side to side and 25cm from top to bottom, required surgery, and made the plaintiff appear as though she "had exceeded the third trimester of pregnancy." (DE 10, p. 273). Dr. Keown reported that the plaintiff had a normal range of motion at all joints, but complained of pain upon movement, and that the plaintiff tried to "hold the hernia still" while walking. (DE 10, p. 273). Dr. Keown reported that the plaintiff was unable to

---

9 The Court notes the discrepancy between the recorded weight here and the reported weight at the first hearing on January 25, 2010, when the plaintiff reported that she weighed about two hundred and forty pounds (DE 10, p. 45).

rise on her heels or toes and was unable to balance on one foot because of the "excessive weight of her abdomen," but was able to balance with both of her feet on the ground (DE 10, p. 273).

### III. Analysis

#### A. Standard of Review

The issue before the Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), is limited to whether there is substantial evidence in the record to support the Commissioner's findings of fact. "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Carrelli v. Comm'r Of Soc. Sec.*, 390 F. App'x 429, 434 (6th Cir. 2010) (quoting *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir.1994)). The Court "may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Carrelli*, 390 F. App'x 429 at 434. If there is "substantial evidence" in the record that supports the Commissioner's decision and the Commissioner applied the correct legal standard, then the Court must affirm the Commissioner's final decision, "even if the Court would decide the matter differently, and even if substantial evidence also supports the [plaintiff's] position." *Id.* (citing *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986) (en banc)).

#### B. Administrative Proceedings

Disability is defined for Title XVI SSI claims as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…." 42 U.S.C. § 1382(c)(a)(3)(A); 20 C.F.R. § 416.905. The ALJ uses a five-step sequential evaluation for SSI claims to determine whether the plaintiff meets this definition of "disabled." 20 C.F.R. § 416.920(a)(4)(i)-(v).

Case 2:12-cv-00004   Document 19   Filed 07/05/13   Page 8 of 23 PageID #: 403

i. If the plaintiff is engaged in substantial gainful activity, the Court will find that the plaintiff is not disabled.

ii. If the plaintiff *does not* have a severe medically determinable physical or mental impairment meeting the duration requirement or a combination of such impairments, the Court will find that the plaintiff is not disabled.

iii. If the plaintiff *does* have an impairment(s) that meets or equals one of the listings of impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1 (Appendix 1) and meets the duration requirement, the Court will find that the plaintiff is disabled.

iv. The court considers the plaintiff's RFC and past relevant work. If the plaintiff can still perform their past relevant work, the Court will find that they are not disabled.

v. The Court considers the plaintiff's RFC, age, education, and experience to determine if the plaintiff can perform work *other than* past relevant work. If the plaintiff can make an adjustment, the Court will find that they are not disabled.

20 C.F.R. § 416.920(a)(4)(i)-(v). The plaintiff has the burden of proof at steps one to four. *Carrelli*, 390 F. App'x at 435. The burden shifts to the Commissioner at step five, where the Commissioner must "identify a significant number of jobs in the economy that accommodate the [plaintiff's] RFC and vocational profile." *Id.* At step five, the ALJ may use the medical-vocational guidelines in 20 C.F.R. pt. 404, Subpt. P, App. 2 (Appendix 2). 20 C.F.R. § 416.969. Appendix 2, referred to as "the grid," provides guidance to the ALJ in determining whether a plaintiff is disabled or whether significant numbers of other jobs exist for the plaintiff. *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003). "Where the findings of fact made with respect to [an] individual's vocational factors and RFC coincide with all of the criteria of a particular rule [in the grid], the rule directs a conclusion as to whether the individual is or is not disabled." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010) (quoting Appendix 2 at § 200.00(a)). Otherwise, instead of using the grid alone, the ALJ must consider all relevant facts. 20 C.F.R. § 416.969.

## C.    Administrative Reliance on Vocational Expert Testimony

If a plaintiff's limitations "do not satisfy the exact requirements of the medical-vocational guidelines, the ALJ [is] entitled to rely on the testimony of a VE in reaching his decision" as to whether the plaintiff is not disabled and a significant number of jobs exist that the plaintiff can perform. *Range v. Soc. Sec. Admin.*, 95 F. App'x 755, 757 (6th Cir. 2004). If an "issue in determining whether [a plaintiff] is disabled is whether [their] work skills can be used in other work and the specific occupations in which they can be used…[the ALJ] may use the services of a VE…." 20 C.F.R. § 416.966(e).

What number of jobs in the national economy constitutes a "significant number" of jobs is a determination that must be made on a case-by-case basis. *Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990) (citing *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir. 1988)). The ALJ may consider "the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." *Id.*

## D.    Notice of Decision

On August 23, 2010, the ALJ denied the plaintiff's claims and made the findings of fact and conclusions of law enumerated below.

1.  Claimant has not engaged in substantial gainful activity since July 7, 2008, the application date.

2.  Claimant has the following severe impairments:  ventral hernia; gallstones; chronic obstructive pulmonary disease; and obesity.

3.  Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1.

4. Claimant has the RFC to perform a limited range of light work except she would require a sit/stand option that would afford her the opportunity to change standing and walking positions after 30 minutes, with no limitations on sitting. She would be precluded from any climbing, kneeling, crouching, crawling, working around hazards such as dangerous moving machinery or unprotected heights, and no more than occasional bilateral pushing or pulling with lower extremities.
5. Claimant is capable of performing past relevant work as a cashier. This work does not require the performance of work related activities precluded by the claimant's RFC.

6. The claimant has not been under a disability, as defined in the Act, since July 7, 2008, the date the application was filed.

(DE 10, pp. 14-17). On January 4, 2011, the ALJ made the specific decision below.

1. Based on the application for SSI filed on July 7, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Act [42 U.S.C. § 1382(c)(a)(3)(A)].

(DE 10, p. 17).

## IV.        Claims of Error

### A.      Whether the ALJ Fully and Fairly Developed the Record

The plaintiff argues that the ALJ failed to fully and fairly develop the record by:  (1) failing to meet a "heightened duty to develop the record;" (2) allowing hearings that were too brief; and (3) not ordering a psychological consultative examination (DE 13, pp. 4-6).

### 1.      Duty to Develop the Record for a *Pro Se* Plaintiff

The plaintiff argues that the ALJ failed to meet a "heightened duty" to develop the record that exists when there is a *pro se* plaintiff (DE 13, p. 4).

"In *Richardson v. Perales,* 402 U.S. 389, (1971), the Supreme Court explained that the ultimate responsibility for ensuring that every claimant receives a full and fair hearing lies with the [ALJ]." *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). "[U]nder special circumstances, when a claimant is:  (1) without counsel; (2) incapable of presenting an effective case; and (3) unfamiliar with hearing procedures, an ALJ has a special, **heightened duty** to develop the record." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459

(6th Cir. 2008) (citing *Lashley*, 708 F.2d at 1051-52) (emphasis added). "Absent such special circumstances…this court repeatedly affirms that the [plaintiff] bears the ultimate burden of proving disability." *Wilson*, 280 F. App'x at 459.

The record shows that a heightened duty would not have applied because while the plaintiff was (1) without counsel, the record does not show that she was (2) incapable of presenting an effective case. She testified that she graduated from high school and that she understood when the ALJ asked, "I can hear what you tell me, but things that you tell me that are wrong with you, I have to have some medical proof that those conditions do, in fact, exist and would cause the disabilities that you allege. You understand that?" (DE 10, p. 43). The ALJ asked the plaintiff three times whether it was her intent to waive her right to have representation, and each time, the plaintiff answered, "Yes, sir." (DE 10, pp. 39-40). At the first hearing, the plaintiff answered the ALJ's questions about her personal history (DE 10, pp. 45-46), her work history (DE 10, pp. 46-51), and her medical history and symptoms (DE 10, pp. 51-54). At the second hearing, the plaintiff answered the ALJ's questions about her recent hospitalization (DE 10, p. 27) and the status of her hernia (DE 10, p. 28). While the plaintiff "chose to proceed without counsel, the hearing transcript discloses her grasp of the proceedings and the adequacy of her case presentation to the ALJ." *Wilson*, 280 F. App'x at 459.

The record also shows that the plaintiff was not (3) unfamiliar with the hearing procedures. At the first hearing, the ALJ explained: his job, which would be "to consider everything that comes before [him];" "the exhibits that [would] be before [him] for consideration;" "the definition of disability;" the "quasi-judicial" nature of the hearing; that the VE would "potentially offer vocational testimony;" that he needed to have "medical proof" of alleged conditions; and that witness testimony would be allowed if it was not "cumulative

testimony." (DE 10, pp. 38-44). At the second hearing, the ALJ reiterated that the issue he had to decide remained the same (DE 10, p. 25).

The record shows that, despite not having a heightened duty to do so, the ALJ still fully and fairly developed the record. The ALJ reviewed objective medical evidence, opinion evidence from the consultative examination, RFC conclusions reached by the state consultants, testimony of the plaintiff, and testimony of the VE (DE 10, pp. 14-17). Therefore, the record provides substantial evidence that the ALJ fully and fairly developed the record and did not fail to meet a heightened duty to develop the record.

## 2.    Brevity of the Hearings

The plaintiff argues that the hearings before the ALJ were brief to the point of being "constitutionally deficient." (DE 10, p. 5).

The brevity of a hearing is not dispositive of whether the ALJ met his duty to develop the record. *Born*, 923 F.2d at 1172 ("[W]e do not believe that the brevity of the hearing…resulted in unfair or unsupported conclusions."). Instead, "[e]ven if the ALJ had questioned [the plaintiff] in greater detail…the "[plaintiff's] subjective complaints of pain must be supported by objective evidence." *Id.*; *see* 20 C.F.R. § 416.908. Brevity is not always a bad thing. It benefited President Abraham Lincoln 150 years ago, and besieged the oft forgotten Edward Everett, the first speaker at the dedication of the Gettysburg National Cemetery in November of 1863, who, after hours of speaking, was expelled into obscurity by Lincoln's speech that began "Four score and seven years ago…" and ended only minutes later.

The record shows that while the hearings were twenty-three and thirteen minutes long, respectively (DE 10, pp. 24, 35, 38, 57), this subjective brevity does not equate to constitutional deficiency. The record shows that the ALJ reviewed the objective medical evidence, including:

the plaintiff's March 20, 2008 visit to Putnam County Primary Care Clinic, when she reported her stomach had rapidly increased in size over the past six months; and the plaintiff's July 07, 2008 visit to the Putnam County Primary Care Clinic, when she was referred for surgery to treat her hernia (DE 10, p. 15, citing the record). The record shows that the ALJ requested a consultative medical examination (DE 10, pp. 55-56) and reviewed the examination report at the second hearing (DE 10, p. 16, citing the record). At the second hearing, the ALJ also reviewed the updated record, including the plaintiff's March 29, 2010 visit to Cookeville Regional ED, when the plaintiff was treated for pneumonia, referred to a PCP, and given a list of surgeons to call regarding repair of her hernia (DE 10, p. 15, citing the record). The ALJ asked the plaintiff, "do you have anything else you think you need to tell me today that would influence the decision that I have to make on your case?" (DE 10, p. 28). The plaintiff testified, "they told me I needed to get something done…because [of] the hernia." (DE 10, p. 28). The ALJ asked, "anything else?" (DE 10, p. 28). The plaintiff testified, "they say it's gotten worse." (DE 10, p. 28). The ALJ asked a third time, "anything else?" The plaintiff testified, "[n]ot that I can think of, no." (DE 10, p. 28). The record shows that the ALJ questioned the plaintiff and reviewed the objective evidence corresponding to the subjective complaints of pain (DE 10, pp. 15-16, citing the record). Therefore, the record provides substantial evidence that the hearings were not deficient, despite being brief.

### 3.     Mental Impairments

The plaintiff argues that the ALJ erred by not ordering a psychological consultative examination (DE 10, pp. 5-6).

When determining whether a plaintiff is disabled, an ALJ will consider not only physical, but also mental impairments that can be "shown by medically acceptable…techniques." 20

C.F.R. § 416.908. An ALJ will consider only impairments which the plaintiff reports that they have or about which the ALJ receives evidence. 20 C.F.R. § 416.912(a).[10] If "medical sources cannot or will not give [the ALJ] sufficient medical evidence about [the plaintiff's] impairment for [the ALJ] to determine whether [the plaintiff is] disabled…[the ALJ] may ask [the plaintiff] to have one or more physical or mental examinations or tests." 20 C.F.R. § 416.917.

The record shows that when the ALJ asked the plaintiff to describe her conditions, the plaintiff testified about her hernia and gallstones, but not about a mental impairment (DE 10, p. 52). When the ALJ asked the plaintiff to describe her daily routine, the plaintiff testified that she spent her days "[g]oing nuts." (DE 10, p. 52). The ALJ asked for clarification, and the plaintiff testified about "[sitting] around the house…," but not about a mental impairment (DE 10, p. 52). The plaintiff testified that her "nerves get so bad" (DE 10, p. 53) in the context of whether she smoked, not whether she had a mental impairment. The ALJ considered the disability report where the plaintiff answered "no" to the question "[h]ave you been seen by a doctor/hospital/clinic or anyone else *for emotional or mental problems*…?" (DE 10, p. 19, citing the record) (emphasis added). The ALJ also considered another report where the plaintiff answered "yes" to the same question, and elaborated that she was "stressed with sickness." (DE 10, p. 19, citing the record). The record shows that the plaintiff presented no evidence of a mental impairment, the ALJ received no evidence of one, and the plaintiff did not state that she had symptoms of one. The record does not show that the medical sources were unable or unwilling to provide enough evidence for the ALJ to determine whether the plaintiff had a

---

10 20 C.F.R. § 416.912(b) ("Evidence is anything [the plaintiff] or anyone else submits to [the ALJ] or that [the ALJ] obtain[s] that relates to [the plaintiff's] claim.").

mental impairment. Therefore, the record provides substantial evidence that the ALJ did not err by choosing not to order a psychological consultative examination.

The record provides substantial evidence that the ALJ fully and fairly developed the record, did not fail to meet a heightened duty to do so, did not allow constitutionally deficient hearings, and did not err by deciding against ordering a psychological consultative examination.

**B.      Whether Substantial Evidence Supports the ALJ's Credibility Determination**

The plaintiff argues that the ALJ:  (1) did not support his credibility determination with substantial evidence; (2) based his credibility determination only on evidence from March 2008; and (3) erred by discrediting the plaintiff based on her lack of medical care without considering the explanation of an inability to pay for care (DE 13 pp. 6-8, 10).

**1.      Credibility Determination Support**

The plaintiff argues that the ALJ did not support his credibility determination with substantial evidence (DE 13, p. 6).

Credibility factors into the disability determination when the ALJ considers the plaintiff's symptoms. SSR 96-7P, 1996 WL 374186. There is a two-part process for evaluating symptoms. First, "the [ALJ] must consider whether there is an underlying medically determinable physical or mental impairment…that could reasonably be expected to produce the individual's…symptoms." Second, "the [ALJ] must evaluate the intensity, persistence, and limiting effects of the…symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7P, 1996 WL 374186. A plaintiff's symptoms will affect their ability to do basic work activities to the extent that the symptoms can reasonably be accepted as consistent with objective medical evidence. However, objective evidence alone does not always reflect the severity of symptoms. When information other than

objective evidence is needed to determine the ***credibility*** of a plaintiff's statements about their symptoms, the ALJ must also consider seven factors, outlined in 20 C.F.R. § 416.929(c). SSR 96-7P, 1996 WL 374186. The factors are: (1) daily activities; (2) location, duration, frequency, and intensity; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication; (5) treatment; (6) measures to relieve pain or other symptoms; and (7) factors concerning functional limitations and restrictions. 20 C.F.R. § 416.929(c).

The record shows that at step 4 of the disability determination, the ALJ first found that the plaintiff had been diagnosed with a hernia and gallstones, and that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (DE 10, p. 15). The ALJ next evaluated the plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms, and found a lack of credibility (DE 10, pp. 15-16).

The record shows that the ALJ considered the 20 C.F.R. § 416.929(c) factors in his credibility determination: (1) ***surgery has been suggested*** [treatment];" (2) "***relatively infrequent trips*** [frequency] to the doctor;" (3) for the ***allegedly disabling symptoms*** [intensity];" (4) "***treatment at the [ED] for pneumonia and shortness of breath*** [treatment];" (5) "allegations of breathing difficulties are tempered by [the plaintiff's] ***admissions that she continues to smoke*** [daily activities];" (6) "***she had a nicotine patch*** [daily activities];" (7) "***while being treated at Cookeville*** [treatment];" and (8) evidence from March 2008 showed that the plaintiff "***had taken care of her mother for the past year…done a lot of lifting*** [daily activities], and…gained approximately one hundred pounds ***over the past one to two years*** [duration]." (DE 10, p. 15) (emphasis added). The ALJ found that the plaintiff's "***lack of cooperation to comply with physician's recommendations for surgery for expected improvement, suggests[ed] her impairments to be self-limiting*** [measures to relieve pain or other symptoms]," and found that

"despite the claimant's alleged impairments, the evidence [fell] well short of corroborating any fully debilitating impairment or combination thereof." (DE 10, p. 16) (emphasis added). Therefore, the record provides substantial evidence that the ALJ supported his credibility determination.

### 2.    Evidence from March 2008

The plaintiff argues that the ALJ "determined that [the plaintiff's] testimony was not entirely credible because 'in March 2008, medical evidence…revealed that [she]…had taken care of her mother for the past year…done a lot of lifting, and stated that she ha[d] gained approximately 100 pounds over the past one to two years.'" (DE 13, p. 7). The plaintiff also argues that the ALJ should not have considered this evidence because it was from a date four months prior to the filing date (DE 13, pp. 7-8).

The ALJ considers all relevant evidence, including the "medical history for at least the 12 months preceding the month in which [the plaintiff] file[s]…." 20 C.F.R. § 416.912(d). If "medical sources cannot or will not give [the ALJ] sufficient medical evidence…the [ALJ] may ask [the plaintiff] to have [a consultative] examination…." 20 C.F.R. § 416.917. "Generally, [the ALJ] will not request a consultative examination until [they] have made every reasonable effort to obtain evidence from [the plaintiff's] own medical sources." 20 C.F.R. § 416.912(e).

The record shows that, to the extent the plaintiff argues that the ALJ based his credibility determination *solely* on the March 2008 evidence, this argument lacks merit, as shown above.[11] The plaintiff's argument, that the ALJ should *not* have considered the March 2008 evidence because it preceded the filing date by four months, also lacks merit. The plaintiff filed for SSI on July 7, 2008 (DE 10, pp. 137-40), and March 2008 is well within the 12 month ambit of evidence

---

11 *See supra* Part IV.B.1.

that the ALJ must consider under 20 C.F.R. § 416.912(d). The March 2008 evidence is the earliest relevant medical evidence in the record,[12] and this is not sufficient to cover the medical history for 12 months preceding the filing date, as required under 20 C.F.R. § 416.912(d). However, the ALJ ordered a consultative examination in order to "be able to make a decision" (DE 10, p. 55), in compliance with 20 C.F.R. §§ 416.917 and 416.912(e). Therefore, the record provides substantial evidence that the ALJ based his credibility determination on more than the March 2008 evidence and that this evidence was appropriate to consider.

### 3. Evaluation of Failure to Seek Medical Treatment and Inability to Pay for Care

The plaintiff argues that the ALJ based his credibility determination on the finding that the plaintiff made "relatively infrequent trips to the doctor" and that the ALJ made this finding without considering an explanation such as an inability to pay for care (DE 13, p. 8).

The ALJ is not permitted to draw inferences about a plaintiff's symptoms based on "failure to seek or pursue regular medical treatment" without considering explanations such as being "unable to afford treatment." SSR 96-7P, 1996 WL 374186.

The record shows that the ALJ considered more than the plaintiff's infrequent trips to the doctor, as demonstrated above,[13] when making his credibility determination. The record also shows that the ALJ did consider the plaintiff's inability to pay for care. The ALJ considered that, on July 07, 2008, the plaintiff presented to the Putnam County Primary Care Clinic and the medical notes from that visit indicated that a foundation was contacted for surgical funds to repair the hernia (DE 10, p. 15, citing the record).[14] The ALJ considered that, on March 29, 2010, the plaintiff presented to the Cookeville Regional ED, where records indicate the plaintiff

---

12 (DE 10, pp. 225-31) The record contains medical evidence from April, 20, 2004 to June 07, 2004, which is outside of the relevant time period.
13 *See supra* Part IV.B.1-2.
14 Exhibits 3F and 4F contain the same documents.

was "self pay." (DE 10, p. 15, citing the record). The record shows that the ALJ considered "medical evidence and testimonies of [the] record as a whole" (DE 10, p. 16), including the plaintiff's testimony that she used over the counter medication because she was unable to find a physician to see her and that she believed this was due to her lack of insurance (DE 10, pp. 51-52). Therefore, the record provides substantial evidence that the ALJ did not discredit the plaintiff based on her lack of medical care and did not fail to consider her inability to pay for care.

The record also shows that the plaintiff was informed of her possible qualification for TennCare insurance coverage and informed about the application process on September 10, 2008, when the Commissioner initially denied the plaintiff's SSI claim (DE 10, pp. 60, 62).[15] The record does not show that the plaintiff attempted to follow up on this suggestion that she apply for TennCare insurance coverage. Had the plaintiff offered evidence that she applied for and was denied TennCare coverage, the Magistrate Judge would have a different view of this issue. There is no evidence that applying for TennCare is not still an option for the plaintiff, as she does need surgery to fix the abdominal hernia.

The record provides substantial evidence that the ALJ supported his credibility determination, appropriately considered evidence from March 2008, and considered the plaintiff's inability to pay for care.

### C.     The Opinion of Dr. Keown in Determining Residual Functional Capacity

---

15 (DE 10, p. 62) ("Even if you cannot get SSI, you may be able to get TennCare. TennCare helps pay medical bills. TennCare can cover people even if they cannot get Medicaid. TennCare may be able to cover you and others in your family who need health insurance. To apply for TennCare, you can go to the nearest county health department, Employment Security office or Department of Human Services (DHS) office. Or you can call the TennCare Family Assistance at 1-866-311-4287. (It is a free call).").

The plaintiff argues that the "ALJ may not substitute his own medical judgment for that of a treating physician" (DE 13, p. 9), and that the ALJ "rejected the opinion of Dr. Keown without reason" by finding that the plaintiff had the RFC to perform a limited range of light work, despite Dr. Keown finding that she was limited to sedentary work (DE 13, pp. 8-9).

An ALJ "will not consider an acceptable medical source to be [the plaintiff's] treating source if [the plaintiff's] relationship with the source is…based…solely on [the] need to obtain a report in support of [the] claim for disability." 20 C.F.R. § 416.902. A non-treating source includes "a consultative examiner…." 20 C.F.R. § 416.902. An ALJ, when determining whether the plaintiff is disabled, must evaluate "every medical opinion," regardless of the source and "will always consider the medical opinions…with the rest of the relevant evidence." 20 C.F.R. § 416.927(b)-(c). However, "[o]pinions on some issues…are not medical opinions…but are, instead, opinions on issues reserved to the [ALJ] because they are…dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 416.927(d). Examples of issues reserved to the ALJ include whether the plaintiff is disabled and what the plaintiff's RFC is. 20 C.F.R. § 416.927(d)(1)-(2). The "final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 416.927(d)(2). The ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 416.927(d)(3).

The record shows that the ALJ did not substitute his opinion for that of a treating physician. The plaintiff's argument is in the section about Dr. Keown (DE 13, p. 9), but an argument that Dr. Keown was a treating physician lacks merit because she was a consultative examiner (DE 10, pp. 271-80), a non-treating physician under 20 C.F.R. § 416.902. Further, the record shows that the ALJ did consider the opinions of treating physicians: "surgery has been

Case 2:12-cv-00004   Document 19   Filed 07/05/13   Page 21 of 23 PageID #: 416

suggested *by different physicians*;" "*records reveal treatment at the [ED]*;" and "*evidence of Putnam County Health Department* reveal[s]…." (DE 10, p. 15) (emphasis added). The ALJ found that the record "*does not contain any opinions from any treating physicians* indicating that the [plaintiff] is disabled or even has limitations greater than those determined in this decision." (DE 10, p. 16) (emphasis added).

The record shows that the ALJ did not reject the opinion of Dr. Keown. The record shows that, in compliance with 20 C.F.R. § 416.927(b)-(c), the ALJ considered the opinion of Dr. Keown with the rest of the evidence. The ALJ cited Dr. Keown's consultative examination, the range of motion that she reported, and the limitations she indicated (DE 10, p. 16, citing the record). The ALJ wrote that he "accept[ed] [Dr. Keown's] assessment in so far as it is consistent with the RFC assigned herein, with exception to the sedentary weight limit." (DE 10, p. 16). The ALJ also considered the medical reports of treating physicians, as described above, and considered the reports from the non-examining state consultants (DE 10, p. 16). In compliance with 20 C.F.R. § 416.927(b)-(d), the ALJ considered the record in its entirety, and assumed the final responsibility for the dispositive determination of RFC. It would have contravened 20 C.F.R. § 416.927(d) for the ALJ to do otherwise or to rely solely on the opinion of Dr. Keown.

The record provides substantial evidence that the ALJ did not substitute his own medical judgment for that of a treating physician and did not reject the opinion of Dr. Keown.

## V. Conclusion

There is substantial evidence within the record to support the Commissioner's findings of fact and the Commissioner applied the correct legal standard.

## VI. Recommendation

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion (DE 12) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

The parties have fourteen (14) days, after being served with a copy of this Report and Recommendation (R&R) to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140 *reh'g denied*, 474 U.S 1111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this __5th__ day of July, 2013.

s/Joe B. Brown_____
Joe B. Brown
U.S. Magistrate Judge
